**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KAREN ERVIN, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DISTRICT OF COLUMBIA, <br><br> *Defendant.* | Civil Action No. 23-3678 (RDM) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Karen Ervin, Brandy Smith, and Diana Walker, three employees of the Metropolitan Police Department ("MPD"), bring this suit against the District of Columbia alleging a widespread practice of sexual harassment and retaliation, condoned and facilitated by the MPD's Equal Employment Opportunity ("EEO") office and others within the MPD. In addition to asserting claims based on Plaintiffs' own alleged experiences of sexual harassment and retaliation, Plaintiffs Ervin and Smith also seek to bring claims on behalf of classes of MPD employees and officers challenging the MPD's alleged pattern or practice of permitting systematic sexual harassment. *See generally* Dkt. 30 (2d Am. Compl.). The District moves to dismiss in part, seeking dismissal of Plaintiffs' individual retaliation claims brought under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.*, as well as the class action claims. *See generally* Dkt. 34. The District does not move to dismiss Plaintiffs' individual claims of sexual harassment brought under Title VII and the DCHRA.

For the following reasons, the Court will **GRANT** in part and **DENY** in part the District's partial motion to dismiss.

## I. BACKGROUND

A.      **Factual Background**

The Court accepts the following factual allegations, taken from Plaintiffs' second amended complaint, *see* Dkt. 30 (2d Am. Compl.), as true for the purpose of resolving the pending motion to dismiss. *See Gordon v. U.S. Capitol Police*, 778 F.3d 158, 163–64 (D.C. Cir. 2015).

1.      *Ervin Allegations*

Plaintiff Karen Ervin began working for the MPD as a civilian employee in 1998.[1]  Dkt. 30 at 16 (2d Am. Compl. ¶ 92).  In 2008, when she was working in customer service in the Second District, she was involuntarily transferred to the First District after filing an EEO complaint against an MPD lieutenant and, despite her civilian employee status, was written up for "conduct unbecoming an officer."[2]  *Id.* at 16–17 (2d Am. Compl. ¶¶ 93–95).  In 2020, Ervin began working alongside MPD Lieutenant Andre Suber in the First District.  *Id.* at 18 (2d Am. Compl. ¶ 110).  While a sergeant, Suber had previously been accused of sexual harassment by his subordinate MPD Officer Tameka Hampton in 2007.  *Id.* at 17 (2d Am. Compl. ¶ 99).  After Hampton reported Suber's unwanted advances, Suber began to stalk and to intimidate her.  *Id.* (2d Am. Compl. ¶¶ 100–03).  Hampton filed an EEO complaint through her union steward, as well as a complaint through the D.C. Office of Human Rights.  *Id*. at 17–18 (2d Am. Compl.

---

[1] As described in the second amended complaint, the MPD has several classes of employees, including both sworn officers (who are members of the Fraternal Order of Police, Lodge #1, and covered by the MPD collective bargaining agreement), and civilian employees (who are governed by the D.C. employee manual).  Dkt. 30 at 6–7 (2d Am. Compl. ¶ 22).

[2] The second amended complaint alternatively refers to the MPD's sub-units as both "divisions" and "districts."  For the sake of consistency, the Court will use "district," which is also the term used on publicly available MPD websites.

¶¶ 104–106).  The EEO case went nowhere after the MPD EEO office concluded that the claim was unfounded.  *Id.* at 18 (2d Am. Compl. ¶ 105).  In contrast, Hampton's D.C. Office of Human Rights complaint resulted in a settlement under which Suber no longer served as Hampton's supervisor but faced no other discipline.  *Id.* (2d Am. Compl. ¶¶ 106–07).

After Ervin and Suber began working together in the First District in 2020, Suber began to harass Ervin in a similar manner.  He "comment[ed] on [Ervin's] physical appearance and how much it pleased him," and, around April–May 2020, he told Ervin that he no longer shared a bedroom with his own wife and further attempted to "elaborate on the state of his own sex life." *Id.* at 18–19 (2d Am. Compl. ¶¶ 112, 114–17).  "Ervin made clear that she was not interested in pursuing any kind of personal or intimate exploration with [him]," at which point Suber "became angry and hostile" and began adopting a "completely different," "curt and harsh" tone with her. *Id.* at 20 (2d Am. Compl. ¶ 121–22).

Following those interactions, Ervin and Suber had little contact for almost two years owing to overlapping periods of injury/medical leave.  *Id.* (2d Am. Compl. ¶¶ 123–25).  In February 2022, when they had both returned to work, however, Suber immediately resumed his "cold, short, aggressive, sarcastic, and biting" communications style and commenced "a campaign of tracking and harassing . . . Ervin" in an "almost identical" manner to his prior treatment of Officer Hampton.  *Id.* at 20–21 (2d Am. Compl. ¶¶ 125–28).  Beyond tracking and intimidating Ervin, he threatened to take (unspecified) disciplinary action against her, "putting her on edge constantly," and he would sit in his vehicle in the station parking lot "tracking her movements" as she "came out of the station building" and "when she arrived at work."  *Id.* at 21 (2d Am. Compl. ¶¶ 130–31).  One day in July 2022, when Ervin arrived slightly late to work, she was docked an hour's pay for tardiness, which Plaintiffs allege was attributable to Suber singling

her out for special monitoring and retaliation. *Id.* at 21–22 (2d Am. Compl. ¶¶ 133–38). That same day, Ervin reported Suber to MPD Captain Kevin Harding, accusing him of sexual harassment, bullying, and retaliation. *Id.* at 22 (2d Am. Compl. ¶ 139). After talking to Suber, Harding spoke with Ervin and initially sought to make excuses for Suber's behavior. *Id.* at 22–23 (2d Am. Compl. ¶ 144). He ultimately agreed, however, to send an email to the MPD EEO office, although that email focused on the reprimand for Ervin's tardiness rather than the more serious issue: Suber's "serial sexual harassment." *Id*. at 23 (2d Am. Compl. ¶¶ 145–46).

After hearing nothing for two weeks, Ervin followed up with Harding and was forwarded an email exchange between Harding and Alphonso Lee, the Director of the MPD EEO office. *Id.* (2d Am. Compl. ¶¶ 147–48). Lee had taken over the EEO office in 2017, working under MPD Assistant Chief of Internal Affairs Wilfredo Manlapaz. *Id.* at 9 (2d Am. Compl. ¶ 39). Plaintiffs allege that Lee, as a matter of office policy, "directed [his subordinates] to intentionally undermine any complaints of sexual harassment filed by female employees." *Id.* at 10 (2d Am. Compl. ¶ 41). Beyond ordering EEO counselors/investigators to find "dirt" on complainants to undermine their claims, Lee required that interviews with complainants be recorded and that the counselors then play those recordings for persons named in complaints, "thus ensuring that word would get out immediately about a complaint and encouraging and enabling retaliation against a complainant." *Id*. (2d Am. Compl. ¶¶ 45–46). Lee also instructed EEO investigators to look for reasons to charge complainants with misconduct, which resulted in "many complainants . . . find[ing] themselves the subject of [internal affairs] investigations immediately after or in close proximity of time to filing EEO complaints." *Id.* at 11 (2d Am. Compl. ¶ 49).

The MPD EEO office's processing of Ervin's complaint allegedly followed that pattern. Ervin filed an EEO complaint in September 2022 and met with an EEO counselor for a

(recorded) interview, at which Ervin discussed Suber's sexual advances and his retaliatory stalking and monitoring. *Id.* at 23 (2d Am. Compl. ¶¶ 150–51). Even though Ervin was told that the interview was confidential, details of her allegations soon spread among her MPD colleagues. *Id.* at 24 (2d Am. Compl. ¶¶ 155, 158). Plaintiffs attribute this to Lee sharing the content of her interview with Suber, as he routinely did for others named in EEO complaints. *Id.* (2d Am. Compl. ¶¶ 156–57). Ervin was told that Suber was "on the war path" and "very angry" about her EEO complaint, and she feared further retaliation. *Id.* at 24–25 (2d Am. Compl. ¶¶ 160–61). After the MPD EEO office dismissed her complaint—partly as untimely and partly because Suber's inappropriate comments had not been witnessed by third parties—Suber "escalated his stalking behavior toward [Ervin], tracking her movements, appearing where she was assigned without justification or basis, and asking others to monitor and report her activities to find reasons to write her up for disciplinary action." *Id.* at 25 (2d Am. Compl. ¶¶ 162, 165).

Ervin filed a charge with the Equal Employment Opportunity Commission ("EEOC") in November 2022, alleging that Suber was subjecting her to a hostile work environment because she had rejected his sexual advances. *Id.* (2d Am. Compl. ¶ 167). Suber continued to "follow[] and monitor[]" her in the following months. *Id.* (2d Am. Compl. ¶ 168). In January 2023, while Ervin was in her car during her lunch break, "Suber pulled his cruiser up behind [her] car, blocking her into her parking spot, and shined his spotlight into her car, which temporarily blinded her." *Id.* at 26 (2d Am. Compl. ¶ 170). Ervin was frightened by the incident, which she believed was an attempt to intimidate her. *Id.* (2d Am. Compl. ¶¶ 172–73). Shortly afterwards, Ervin wrote a letter to D.C. Mayor Muriel Bowser and to MPD leadership, "informing them of the fact that MPD maintains a culture that tolerates the sexual harassment of Black women and

that she was being retaliated against because she rejected . . . Suber's advances and because she had engaged in protected activity." *Id.* (2d Am. Compl. ¶ 174).

Ervin then received her first negative performance evaluation in over a decade in February 2023, which she alleges was issued in retaliation for her reporting Suber's behavior and for her subsequent EEOC charge. *Id.* at 27 (2d Am. Compl. ¶ 180). Ervin appealed the evaluation and succeeded in having it removed from her file. *Id.* (2d Am. Compl. ¶ 181). In October 2023, Ervin applied for a promotion to an MPD Staff Assistant position. *Id.* (2d Am. Compl. ¶ 182). Even though she was "by far the most experienced and qualified person who applied for the position," she was informed on January 4, 2024—a month after this lawsuit was filed—that she had been passed over in favor of Kristen Cousins, who had 20 fewer years of experience. *Id.* (2d Am. Compl. ¶¶ 183–85). Plaintiffs allege that this decision was made in further retaliation for Ervin's protected activity. *Id.* at 28 (2d Am. Compl. ¶ 187).

2.    *Smith Allegations*

Plaintiff Brandy Smith joined the MPD as a cadet in 2019 and was assigned to the First District as an officer in 2020.[3] *Id.* (2d Am. Compl. ¶¶ 189–90). At the MPD academy, she was subjected to bullying and sexual harassment, but her complaints were ignored. *Id.* (2d Am. Compl. ¶¶ 191–94). Smith was serving in the First District when Suber returned to work following his injury leave, at which point she became his next target. *Id.* at 29 (2d Am. Compl. ¶¶ 199–200). Suber began sexually harassing Smith by inviting her to his office for closed-door meetings and then telling her "that he was no longer having sex with his wife and that his sexual needs were not being met." *Id.* (2d Am. Compl. ¶¶ 201–02). Suber also attempted to kiss Smith

---

[3] Confusingly, the Second Amended Complaint gives both 2020 and 2021 dates for Smith's start date in the First District. Dkt. 30 at 28–29 (2d Am. Compl. ¶¶ 190, 198).

in his office in January 2023, propositioned her to have sex in a conference room in February 2023, called her "at all hours of the day," including when she was off duty, and stalked her around the MPD office. *Id.* at 29–30 (2d Am. Compl. ¶¶ 204–07). Smith informed Suber that she was not interested, at which point—as with Ervin—he turned hostile, began retaliating against her "by writing her up for every little violation he could divine," and directed his subordinates to do the same. *Id.* at 30 (2d Am. Compl. ¶¶ 208–10). Suber also continued to stalk her, denied her leave requests, and assigned her undesirable tasks. *Id.* (2d Am. Compl. ¶¶ 211–12). Smith required mental health counseling to deal with the stress from Suber's continued harassment. *Id.* at 31 (2d Am. Compl. ¶ 221).

Based on her understanding that the MPD EEO office had failed to respond to employees' complaints about Suber's behavior in the past, Smith reached out to her union representative to file an EEO complaint on her behalf in August 2023. *Id.* at 30–31 (2d Am. Compl. ¶¶ 214–15, 223). MPD officers who were friendly with Suber then "started to ostracize [her] for having filed a complaint." *Id.* at 31 (2d Am. Compl. ¶ 225). By this time, however, the MPD EEO office had been reorganized, with Lee reassigned to a new position and the investigative and counseling functions moved to different MPD divisions. *Id.* at 31–32 (2d Am. Compl. ¶¶ 226–28). With Lee no longer in a position to prevent an effective investigation, the EEO office substantiated Smith's sexual harassment claim. *Id.* at 32 (2d Am. Compl. ¶ 229).

Despite that determination, Smith continued to face hostile treatment from other MPD officers. After this suit was filed, she was "cut off from working overtime [and] denied important training opportunities," even though she had previously been told that she would receive Crisis Intervention Officer training and rifle training. *Id.* (2d Am. Compl. ¶¶ 233–34). Her supervisors also began ordering her "to do menial tasks" and assigned her to unfavorable

patrol areas and other "dangerous assignments." *Id.* at 32–33 (2d Am. Compl. ¶ 235). Finally, in February 2024 (a few months after the commencement of this suit) Smith was involved in an "incident" in which her vehicle was attacked and its window smashed. *Id.* at 33 (2d Am. Compl. ¶ 241). Smith experienced trauma following that incident and needed to take time off to manage her stress, but the MPD denied her coverage for this work-related injury. *Id.* (2d Am. Compl. ¶¶ 238–40). Plaintiffs allege that Smith was unfairly "investigated" and detained by officers at the scene, baselessly accused of "conduct unbecoming an officer and false statements," and is awaiting a hearing after being recommended for termination. *Id.* at 33–34 (2d Am. Compl. ¶¶ 237, 241, 243–45). Plaintiffs allege that the MPD response to the incident was contrived to force Smith out of the MPD in retaliation for reporting and objecting to Suber's sexual harassment. *Id.* at 34 (2d Am. Compl. ¶ 247).

3.    *Walker Allegations*

Plaintiff Diana Walker joined the MPD as a cadet in June 2018 and later trained as a recruit officer. *Id.* (2d Am. Compl. ¶¶ 248–49). She experienced several incidents of sexual harassment while serving at the MPD, including being asked on a date by the head of the MPD academy following her academy graduation, being propositioned for sex at work by an MPD detective, and being repeatedly propositioned and followed by MPD Sergeant Tracie Kenny. *Id.* at 34–36 (2d Am. Compl. ¶¶ 252–65). Because she feared retaliation and knew that the MPD tolerated such behavior, she did not report any of those incidents. *Id.* at 35–36 (2d Am. Compl. ¶¶ 256, 258–59, 263, 265). After going on maternity leave, Walker returned to work in January 2023 in the First District, where her direct supervisor was Lieutenant Yussouf Edwards. *Id.* at 36 (2d Am. Compl. ¶¶ 266–68). When he was alone with Walker, Edwards frequently made sexually explicit comments and asked to touch her. *Id.* at 37 (2d Am. Compl. ¶¶ 272–75).

8

Walker repeatedly told Edwards that she was not interested and told him to stop, but the behavior continued. *Id.* at 37–38 (2d Am. Compl. ¶¶ 276–82).

In May 2023, Walker experienced a "traumatic situation in which a civilian pulled . . . a gun on her, and she feared for her life." *Id.* at 38 (2d Am. Compl. ¶ 283). Because of the stress of the incident, she required counseling and took time off work. *Id.* (2d Am. Compl. ¶¶ 284–85). MPD Lieutenant Shade' Harris, one of the First District's senior officers, was assigned to write an official report regarding the event. *Id.* at 36, 38 (2d Am. Compl. ¶¶ 268, 286). Plaintiffs allege that this was procedurally irregular because Suber, not Harris, was the watch captain at the time and should have been responsible. *Id.* at 38 (2d Am. Compl. ¶ 287). Harris's report was inaccurate (contradicting body camera footage of the event) and failed to include Walker's own description of what happened. *Id.* at 39 (2d Am. Compl. ¶¶ 288–89). Because of that "biased and inaccurate" report, Walker's time off following the incident was erroneously categorized as not work-related, "which forced her to burn leave[] and disadvantaged her financially." *Id.* (2d Am. Compl. ¶ 290). Plaintiffs allege that, to retaliate against Walker, Suber directed Harris to prepare the inaccurate report to prevent her from obtaining the paid leave to which she would have been entitled had her absence been attributed to a work-related illness. *Id.* at 39–40 (2d Am. Compl. ¶¶ 291, 300). When Walker objected, Harris refused to revise his report, and her appeal was also unsuccessful. *Id.* at 40 (2d Am. Compl. ¶¶ 298–99, 302).

Following that incident, Walker also reached out to other (current and former) MPD officers, who ultimately contacted Harding—the same MPD lieutenant to whom Ervin had previously reported Suber's sexual harassment. *Id.* at 39 (2d Am. Compl. ¶¶ 292–95). Harding approached Walker to speak about her situation and—although Plaintiffs' allegations are not entirely clear—it appears that the two discussed not only Walker's denied leave, but also the

prior sexual harassment by Edwards. *Id.* at 39–40 (2d Am. Compl. ¶¶ 294–96). Plaintiffs allege that Harding, "or someone acting on his behalf," then reached out to the MPD EEO office (at the time still headed by Lee), which instructed Walker on how to file an EEO complaint. *Id.* at 40 (2d Am. Compl. ¶¶ 296–97).

**B.     Procedural History**

Plaintiffs filed this suit against the District of Columbia in December 2023, asserting individual claims for race and gender discrimination and retaliation under 42 U.S.C. § 1981, Title VII, and the DCHRA. *See generally* Dkt. 1 (Compl.). After the District moved to dismiss Plaintiffs' complaint in its entirety, *see* Dkt. 9, Plaintiffs filed a consent motion representing that they intended to amend their complaint to add additional Title VII and DCHRA claims (some of which were not yet ripe, as Plaintiffs had yet to receive the right to sue letters from the EEOC) and asking the Court to stay proceedings and toll the affected statute(s) of limitations, *see* Dkt. 11. The Court granted that motion, *see* Min. Order (Apr. 12, 2024), and Plaintiffs filed an amended complaint in August 2024, *see* Dkt. 16 (Am. Compl.). In the amended complaint, Plaintiffs asserted individual claims (brought by Smith and Ervin) for retaliation under Title VII and the DCHRA, as well as class claims on behalf of female MPD employees and a subclass of African American MPD employees for gender discrimination, retaliation, and race discrimination under Title VII, the DCHRA, and Section 1981. *See generally id.*

This time, the District filed a partial motion to dismiss, *see* Dkt. 20, and the Court permitted Plaintiffs to defer their motion for class certification until after the Court ruled on that motion, *see* Min. Order (Oct. 28, 2024). The Court then dismissed the amended complaint without prejudice under Federal Rules of Civil Procedure 8 and 12 at a hearing held on May 28, 2025. *See* Min. Entry (May 28, 2025); Dkt. 40 (transcript of the May 28, 2025, proceedings). As the Court explained, even after efforts to clarify the matter with Plaintiffs' counsel there

remained "quite a bit of confusion with respect to the gender-based claims [and] the nature of those claims," including whether Plaintiffs were alleging that the MPD EEO office had itself engaged in discriminatory conduct or were instead challenging the alleged acts of harassment by individual supervisors, as well as which specific incidents of retaliatory conduct Plaintiffs claimed had violated the relevant statutes. Dkt. 40 at 52. The Court also noted that there was "very little in the complaint at all about race" in support of Plaintiffs' claims of race discrimination. *Id.* The Court did, however, permit Plaintiffs to file an amended complaint with "greater specific factual allegations" and a clearer tie between those allegations and Plaintiffs' claims for relief under their various asserted causes of action. *Id.* at 52–53.

In response, Plaintiffs filed the now operative second amended complaint in August 2025. *See* Dkt. 30 (2d Am. Compl.). In this pleading, Plaintiffs abandon their allegations of race discrimination and instead assert the following individual claims: First, Smith and Walker assert claims for sexual harassment under Title VII (Counts I and II) and the DCHRA (Counts III and IV). *Id.* at 41–42 (2d Am. Compl. ¶¶ 306–17). Second, Ervin, Smith, and Walker assert individual claims for retaliation under Title VII (Counts V, VI, and VII) and the DCHRA (Counts VIII, IX, and X), alleging that, in retaliation for their protected activity opposing sexual harassment, they experienced both discrete actionable incidents of retaliation as well as a retaliatory hostile work environment. *Id.* at 42–44 (2d Am. Compl. ¶¶ 318–29).

Plaintiffs also assert several class claims. Ervin seeks to represent a class of:

> All *civilian* female employees who were subject to or affected by [the] MPD's EEO policies and practices, which had the effect of fostering a work environment that allowed and enabled disparate treatment of female employees via sexual harassment and retaliation, and denied them the protections of [the] MPD's proffered written policies.

11

*Id.* at 44 (2d Am. Compl. ¶ 330) (emphasis added). Smith seeks to represent an essentially identical class of MPD *sworn officer* female employees who were similarly mistreated by the MPD's EEO policies and practices. *Id.* (2d Am. Compl. ¶ 331). In particular, Ervin asserts a gender-based disparate treatment class claim under Title VII (Count XI) alleging that the MPD EEO policies discriminated against women, that women's complaints about retaliatory harassment were not taken seriously, and that those policies created a hostile work environment that encouraged sexual harassment and "create[d] disparate terms and conditions of employment for women than men." *Id.* at 47–49 (2d Am. Compl. ¶¶ 340–53). Ervin also asserts an identical class claim under the DCHRA (Count XII). *Id.* at 49–50 (2d Am. Compl. ¶¶ 354–57). Smith asserts equivalent class claims on behalf of Plaintiffs' putative sworn officer female employee class (Counts XIII and XIV). *Id.* at 50–52 (2d Am. Compl. ¶¶ 358–75). Plaintiffs request $300,000 in damages for each Title VII claim, $750,000 in damages for each DCHRA claim, further damages on behalf of the putative classes to be calculated following discovery, and (largely unspecified) injunctive and declaratory relief. *Id.* at 52–53 (2d Am. Compl. ¶¶ 376–79).

Defendant once again moved to dismiss in part. *See* Dkt. 34. The District's motion does not challenge the legal sufficiency of Smith and Walker's individual claims for sexual harassment under Title VII and the DCHRA (Counts I–IV), but it asks that the Court dismiss the individual retaliation claims and all of the class claims. *Id.* at 7–8.

## II. LEGAL STANDARD

A proper complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). Rule 8 of the Federal Rules of Civil Procedure requires that the complaint contain a short and plain statement of the grounds upon which the Court's jurisdiction depends, a short and plain

12

statement of the claim showing that the pleader is entitled to relief, and a demand for the relief the pleader seeks.  Fed. R. Civ. P. 8(a).  The purpose of the minimum standard of Rule 8 is to give fair notice to the defendant of the claim being asserted, sufficient to prepare a responsive answer, to prepare an adequate defense, and to determine whether the doctrine of *res judicata* applies.  *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977).

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) go beyond the requirements of Rule 8 and "test[] the legal sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  This examination requires the Court to "first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'"  *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations in original and citation omitted) (quoting *Iqbal*, 556 U.S. at 675, 678).  That "facial plausibility" standard requires that "the plaintiff plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  A plaintiff need not make "detailed factual allegations" to withstand a Rule 12(b)(6) motion, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face," *Iqbal*, 556 U.S. at 678 (citation modified).  Thus, a complaint may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," but the facts alleged "must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555–56 (citation modified).

13

**III. ANALYSIS**

**A.      Non-Complaint Materials**

The Court begins with a threshold issue concerning the exhibits attached to Plaintiffs'

complaint.  In addition to that complaint, Plaintiffs filed (first as an attachment to the complaint,

and then as errata in separate filings) declarations, under the penalty of perjury, from Rosemarie

Lucero, Harry Lee Carter, Jr., David L. Simmons, and Renae Lee.  *See* Dkt. 30-1; Dkt. 31; Dkt.

32.  Those declarations were originally filed in a separate case in this Court, *Brinkley v. District

of Columbia*, No. 21-cv-1537, in which another group of MPD employee plaintiffs (represented

by Plaintiffs' same counsel in this case) brought a suit against the District alleging race, gender,

and age discrimination along with other claims.  *See generally* 3d Am. Compl., *Brinkley* (D.D.C.

June 7, 2024), Dkt. 42.  The declarants, who worked in the MPD EEO office under Lee's

supervision, attest that Lee directed the EEO office to find ways to undermine employees who

filed EEO complaints, leaked information shared by complainants to third parties (including

persons named in EEO complaints), and bullied and retaliated against those in the EEO office

who objected.  *See generally* Dkt. 32.  Plaintiffs' complaint in this action "reference[s] and

incorporate[s]" the allegations contained in those declarations "as if fully stated herein."  Dkt. 30

at 10 (2d Am. Compl. ¶ 44).

In its motion to dismiss, the District argues that the Court should decline to consider

those exhibits at the pleading stage because Plaintiffs' reliance on the declarations' "extraneous

and evidentiary material" violates Federal Rule of Civil Procedure 10.  Dkt. 34 at 16–17.  Rule

10 provides that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the

pleading for all purposes."  Fed. R. Civ. P. 10(c).  In the District's view, that provision's

reference to a "written instrument" is limited, as the Second and Third Circuits have held, to "a

legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract,

will, promissory note, or share certificate," rather than an affidavit.  Dkt. 34 at 16–17 (quoting

*Millers Cap. Ins., Co. v. Hydrofarm, Inc.*, No. 21-cv-321, 2022 WL 1773610, at *3 (D.D.C. June

1, 2022)); *see also Smith v. Hogan*, 794 F.3d 249, 254–55 (2d Cir. 2015) (holding that an

affidavit containing "a personal, narrative summary of [the plaintiff's] experiences" did not

qualify as a "written instrument" under Rule 10(c)); *Rose v. Bartle*, 871 F.2d 331, 339 n.3 (3d

Cir. 1989) (same).  Plaintiffs, for their part, argue that the relevant declarations were not

proffered as "written instruments," but instead as additional factual allegations cross-referenced

in the second amended complaint as authorized by Rule 10.  Dkt. 38 at 8–9; *see* Fed. R. Civ. P.

10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or

in any other pleading or motion.").

The Court agrees with the District that the Federal Rules contemplate that Plaintiffs

should include factual allegations of the type contained in the disputed declarations in the body

of the complaint itself, rather than in narrative attachments labeled as exhibits.  *See* Fed. R. Civ.

P. 10(b) ("A party must state its claims or defenses in numbered paragraphs, each limited as far

as practicable to a single set of circumstances.").  There is no reason that the assertions contained

in such narrative attachments could not be set forth as allegations in the body of the complaint,

which would avoid any question as to whether counsel's certification under Rule 11 applies to

those allegations and would permit opposing counsel to comply with Rule 8's requirement to

admit or deny each factual allegation.  And to the extent that including the narrative assertions in

the complaint itself would run afoul of Rule 8's requirement that the complaint contain "a *short*

*and plain* statement of the claim," Fed. R. Civ. P. 8(a)(2) (emphasis added), that is just the point;

incorporating lengthy attachments by reference undermines the purpose of Rule 8.  But, as

Defendant acknowledges, the D.C. Circuit has never held that an affidavit or declaration cannot

qualify as a "written instrument" under Rule 10(c), *see* Dkt. 34 at 16, and decisions in this District routinely consider "documents attached as exhibits or incorporated by reference in the complaint" when resolving a motion to dismiss. *Atchison v. U.S. Dist. Cts.*, 190 F. Supp. 3d 78, 93 (D.D.C. 2016) (quoting *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011)); *see also Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) ("Federal Rule of Civil Procedure 10(c) permits a plaintiff to attach an exhibit to the complaint, rendering the exhibit 'part of the pleading for all purposes.'").

More importantly, unlike in the cases that the District invokes, Plaintiffs are not using the declarations to pursue "a legal theory that appears nowhere on the face of the [operative complaint]." *Smith*, 794 F.3d at 255. The essential contentions of the declarations—that, under Lee, the MPD EEO office worked to undermine and to discredit reports of discrimination—are already included as factual allegations within Plaintiffs' complaint. *See, e.g.*, Dkt. 30 at 10–11 (2d Am. Compl. ¶¶ 45–48) (alleging that Lee "intervened in EEO investigations to ensure that complainants were disbelieved," played recordings of EEO interviews "for the targets of the investigation, thus ensuring that word would get out immediately about a complaint and encouraging and enabling retaliation against a complainant," and "required his investigators to probe the backgrounds of complainants to find reasons to discredit them and/or reasons to investigate the complainants for misconduct"); *id.* at 48–49 (2d Am. Compl. ¶¶ 344–350) (alleging that the MPD EEO office maintains a policy of violating complainants' confidentiality, "investigating," "intimidating," and "attacking the[] credibility" of female complainants, and otherwise ignoring sexual harassment complaints). Even if the Court, therefore, were to ignore the more detailed allegations of the MPD EEO office's practices contained in the declarations, it

16

would not affect the disposition of the present motion because the Court would nonetheless accept the equivalent allegations within the complaint itself and proceed on that basis.

Finally, Plaintiffs clearly incorporate each and every allegation contained in the declarations "as if *fully* stated" in the complaint itself. *Id.* at 10 (2d Am. Compl. ¶ 44) (emphasis added). On the Court's reading, this assertion does not invite any ambiguity about which allegations Plaintiffs (and Plaintiffs' counsel) stand by and which they do not, and it brings the declarations within the ambit of Rule 11. It follows that little would be gained by requiring Plaintiffs to replead at this point in the litigation. In short, although far from a model for how others should plead—or for how Plaintiffs' counsel should plead in the future—the Court is unpersuaded that counsel's shortcut in this case makes a difference.

The same is not true, however, for Plaintiffs' general reference to the allegations in a third case in this Court, *Carter v. District of Columbia*, No. 22-cv-426. In that case, employees of the MPD EEO office, also represented by Plaintiffs' same counsel, have asserted claims against the District for violations of a D.C. whistleblower protection statute as well as race and gender discrimination. *See generally* Am. Compl., *Carter* (D.D.C. June 13, 2022), Dkt. 9. In the second amended complaint in this action, Plaintiffs note the existence of that suit and then "reference and incorporate all of the factual allegations outlined in [*Carter*], as if fully restated herein." Dkt. 30 at 10 (2d Am. Compl. ¶¶ 41–42). Unlike the declarations discussed above, Plaintiffs do not attach a copy of the relevant allegations from *Carter* to their pleadings. Such a cursory, undeveloped reference to "all of the factual allegations outlined" in a *different* case does not comport with Plaintiffs' obligations under Rule 8, as it fails to give Defendant "fair notice of the claim being asserted" or a reasonable "opportunity to file a responsive answer" to the various allegations included in the *Carter* litigation but not referenced in Plaintiffs' complaint here.

17

*Brown*, 75 F.R.D. at 498. Even limiting Plaintiffs' attempted "incorporation" to the amended complaint in that action, it is difficult to believe that every allegation in the 469 paragraphs of that complaint is relevant (and non-extraneous) to this case. The Court, accordingly, will not consider the pleadings in the *Carter* case in resolving the pending motion to dismiss.[4]

**B.      Administrative Exhaustion**

The District next argues that Plaintiffs' Title VII retaliation claims should be dismissed insofar as they rely on discrete incidents that Plaintiffs failed timely to raise before the EEOC. Dkt. 34 at 17–19. Here, as in other portions of the motion to dismiss, the parties' arguments are hampered by the lack of clarity in Plaintiffs' allegations. After devoting 40 pages to describing Plaintiffs' individual experiences working for the MPD, the complaint's specific counts of retaliation (Counts V–X) allege only that "[a]s a result of their protected activity, Plaintiffs were subjected to serious retaliation, both in the form of prohibited personnel actions and in the form of a hostile work environment," without providing any additional guidance on which of the many allegedly "prohibited personnel actions" discussed in the narrative portion of the complaint serve to anchor Plaintiffs' claims. Dkt. 30 at 43 (2d Am. Compl. ¶¶ 321, 327). In response to Defendant's argument that several of those (possibly) alleged acts of retaliation were not timely exhausted, Dkt. 34 at 17–19, Plaintiffs unreasonably criticize the District for "confus[ing] allegations that are included as a factual background with allegations upon which Plaintiffs seek a specific remedy," Dkt. 38 at 10. But Plaintiffs' complaint itself makes no effort to distinguish

---

[4] The Court likewise will not consider any additional factual allegations included in the various attachments to Plaintiffs' opposition to the motion to dismiss, which appear to include filings from the *Carter* case as well as materials from related D.C. Superior Court litigation and administrative proceedings. *See* Dkts. 38-1, 38-2; *see also Hawkins v. WMATA*, 311 F. Supp. 3d 94, 109 (D.D.C. 2018) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." (citation modified)).

the allegations intended "to help establish the background, context, and corporate culture of [the] MPD" from those that actually "support Plaintiffs' claims." *Id.* In the absence of any such differentiation, the District cannot be faulted for proceeding overinclusively.

As for the merits of the exhaustion issue, Title VII ordinarily requires a plaintiff to file an EEOC charge "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). Defendant, however, acknowledges that Plaintiffs' claims benefit from a more generous 300-day deadline pursuant to a work-sharing agreement between the EEOC and the D.C. Office of Human Rights. Dkt. 34 at 17 (citing *Slate v. Pub. Def. Serv. for the Dist. of Columbia*, 31 F. Supp. 3d 277, 294–95 (D.D.C. 2014)); *see also* 42 U.S.C. § 2000e-5(e)(1). Although there was previously "some disagreement in the case law about whether an employee's eventual lawsuit is limited to claims included in the administrative complaint or whether the employee may also bring suit for 'claims that are like or reasonably related to the allegations' in the complaint," *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 175 (D.D.C. 2016) (quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995)); *see also Webster v. Del Toro*, 49 F.4th 562, 568 (D.C. Cir. 2022) (declining to decide whether *Park* remains good law), it is now clear that "the 'reasonably related' rule no longer reflects the state of the law," *Hargrove v. AARP*, 205 F. Supp. 3d 96, 119 (D.D.C. 2016) (citation modified). As the Supreme Court has emphasized, a plaintiff must file a timely EEOC charge for each discrete retaliatory act she wishes to challenge. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). A claim for a retaliatory hostile work environment, by contrast, is timely so long as the plaintiff files an EEOC charge that is timely with respect to "any act that is part of the hostile work environment." *Id.* at 118.

19

To the extent that Plaintiffs seek to assert claims based on incidents that Defendant argues were not timely exhausted before the EEOC—as opposed to merely treating those allegations as contextual—the Court declines to resolve the administrative exhaustion question on the present posture. As the Court has previously explained, Title VII's exhaustion requirement is "an affirmative defense" and Plaintiffs, consequently, "are not required to plead exhaustion." *Achagzai*, 170 F. Supp. 3d at 174. The situation might be different if Defendant could "identify[] allegations in the complaint that effectively conceded a failure to exhaust." *Id.* But the District identifies no such defect in this case. *See* Dkt. 34 at 17–19; *see also* Dkt. 30 at 5 (2d Am. Compl. ¶¶ 11–19) (alleging that Plaintiffs Ervin, Smith, and Walker filed EEOC charges, received right to sue letters, and timely filed suit in this Court). As a result, the Court cannot conclude that Plaintiffs' "failure to exhaust is evident on the face of the complaint." *Horsey v. U.S. Dep't of State*, 170 F. Supp. 3d 256, 265 (D.D.C. 2016). Nor has Defendant moved in the alternative for summary judgment and presented a statement of undisputed material facts pertaining to the exhaustion issue. *Cf. Achagzai*, 170 F. Supp. 3d at 174–75 ("[H]ad the [defendant] simply moved to dismiss [under an exhaustion theory] . . . it would not be entitled to prevail at this stage of the proceeding. [The defendant] went further, however, and also moved for summary judgment [and] submitted evidence" in support of their motion.).

The District's motion to dismiss attaches copies of Plaintiffs' EEOC charges as exhibits to the motion and asks the Court to determine the timeliness and proper scope of Plaintiffs' claims by reference to those materials. *See* Dkts. 34-1, 34-2, 34-3, 34-4, 34-5, 34-6. The District does not contend that Plaintiffs categorically failed to exhaust their administrative remedies or that this suit was not timely filed; it argues only that Plaintiffs cannot pursue any claims based on individual acts of retaliation that were not timely exhausted in those EEOC charges. *See* Dkt. 34

at 17.  The Court agrees with that statement of law, but it will defer resolution of the underlying question until the parties have provided a full record as to the nature and timing of the alleged acts of retaliation that Plaintiffs seek to challenge and to Plaintiffs' efforts to pursue their administrative remedies.

## C.    Retaliation Claims

The District also moves to dismiss Plaintiffs' Title VII and DCHRA retaliation claims. "Retaliation claims under the DCHRA are analyzed using the same legal framework as federal retaliation claims under Title VII."  *Murphy v. District of Columbia*, 390 F. Supp. 3d 59, 72 (D.D.C. 2019) (citation modified); *see also Howard Univ. v. Green*, 652 A.2d 41, 45 & n.3 (D.C. 1994).  Plaintiffs' allegations supporting their Title VII and DCHRA retaliation claims are identical, *see* Dkt. 30 at 42–44 (2d Am. Compl. ¶¶ 318–29), and the parties do not distinguish between the two statutes in their briefing on the motion to dismiss, *see, e.g.*, Dkt. 34 at 19–20; Dkt. 38 at 15.  The Court will therefore consider Plaintiffs' Title VII and DCHRA retaliation claims together.

"To prove unlawful retaliation [under Title VII], a plaintiff must show: (1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action 'because' the employee opposed the practice."  *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012).  At the pleading stage, a plaintiff need not establish a prima facie case of retaliation, *Bynum v. District of Columbia*, 424 F. Supp. 3d 122, 129 (D.D.C. 2020), but must "allege[] facts that, taken as true, render [a] claim of retaliation plausible," *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015). Plaintiffs proffer two theories of retaliation in their complaint: first, that they experienced discrete acts of retaliation and, second, that they were subjected to a retaliatory hostile work environment.  Dkt. 30 at 43 (2d Am. Compl. ¶¶ 321, 327).  The Court addresses each in turn.

21

      1.      *Acts of Retaliation*

As with the issue of administrative exhaustion, the parties' briefing on Plaintiffs' claims

of individual acts of retaliation is confused owing to Plaintiffs' failure to indicate in the operative

complaint which of the many incidents described therein allegedly qualify as materially adverse

actions.  Lacking such guidance, the District understandably attempts to respond to each of the

events discussed in that pleading.  *See, e.g.*, Dkt. 34 at 20–22.  Plaintiffs unreasonably criticize

the District for seeking to "dismiss[] claims Plaintiffs are not making" and then maintain,

without further explanation, that the complaint is "abundantly clear" as to which incidents are

alleged to constitute discrete acts of retaliation and which support Plaintiffs' claims of a

discriminatory hostile work environment or are merely contextual background information.  Dkt.

38 at 15.

Given this posture, the Court's analysis proceeds as follows.  In every instance in which

Plaintiffs simply do not respond to Defendant's arguments concerning a specific act mentioned

in the complaint that Plaintiffs might—or might not—intend to treat as a discrete act of

retaliation, the Court will grant the motion to dismiss on the grounds that, either, Plaintiffs must

not intend to treat the act as a discrete act of retaliation, or Plaintiffs have forfeited that portion of

their claim.  *See Colindres v. U.S. Dep't of State*, 71 F.4th 1018, 1025 (D.C. Cir. 2023) (a party

forfeits an argument by failing to address it in an opposition to a motion to dismiss).  For those

incidents in which Plaintiffs do respond, the Court will assess whether Plaintiffs have alleged

facts sufficient to state a plausible claim of retaliation.

      a.  <u>Ervin</u>

In the motion to dismiss, the District identifies five *possible* acts of retaliation:

(1) Ervin's November 2022 negative performance evaluation; (2) her November 2022 loss of pay

for tardiness; (3) her monitoring by Suber (including the January 2023 incident where he pulled

up behind Ervin's car and shined a spotlight into it); (4) her being subjected to threats of discipline and investigations into her conduct; and (5) her denial of a promotion to Staff Assistant. Dkt. 34 at 20. Plaintiffs' opposition to the motion to dismiss addresses only the promotion, Dkt. 38 at 16–17, and the Court will, as discussed above, grant the motion to dismiss as to the other incidents.

As for the denial of the promotion, the District argues that Plaintiffs' claim fails because they have not "plausibly allege[d] that [Ervin] was either qualified for the position to which she applied or more qualified than the selected applicant." Dkt. 34 at 21. "To establish a prima facie case of unlawful retaliation based on a failure to hire, [a] plaintiff must show . . . that he applied for an available job and was qualified for that position." *Amiri v. Securitas Sec. Servs. USA, Inc.*, 35 F. Supp. 3d 41, 46 (D.D.C. 2014). But, as the Court explained above, a plaintiff is not required to make out a full prima facie case for retaliation at the pleading stage.

Here, Plaintiffs have alleged enough—albeit just enough—to give rise to a plausible inference of retaliation and thus to survive the District's motion to dismiss. The District argues that Plaintiffs' allegations that Ervin was "by far the most experienced and qualified person who applied for the [Staff Assistant] position" are conclusory and need not be credited. Dkt. 30 at 27 (2d Am. Compl. ¶ 183); Dkt. 34 at 22. Although that contention is colorable, the Court must read the complaint as a whole and in the most favorable light to Plaintiffs. In addition to alleging in admittedly conclusory terms that Ervin was the most experienced and qualified candidate, Plaintiffs also allege that she had twenty years more experience than the candidate who was selected, that Ervin had previously spoken with MPD management about the position and been told something to the effect that she was likely "in a good position to get the promotion," that she was nonetheless never even given the opportunity to interview, and that the promotion decision

23

was made shortly after Plaintiffs filed this suit.  Dkt. 30 at 27 (2d Am. Compl. ¶¶ 183–86).

Taken together, these allegations suffice at this early stage of the proceeding.

Plaintiffs will need substantially more evidence to carry their burden at summary

judgment, but the Court will deny the motion to dismiss as to Ervin's claim that the failure to

promote was retaliatory.

>    b.  Smith

The District's motion to dismiss identifies six possible bases for Smith's retaliation

claims, including (1) her changes in assignments; (2) her denial of training opportunities; (3) her

denial of leave requests; (4) her denial of overtime opportunities; (5) "unspecified disciplinary

writeups;" and (6) the MPD's response to the February 2024 incident where her vehicle was

attacked.  Dkt. 34 at 22.  Plaintiffs' opposition discusses only the lost overtime opportunities,

Dkt. 38 at 17–18, and the Court will, accordingly, grant the motion to dismiss as to the other

incidents.

On the overtime issue, Plaintiffs allege, without any further detail, that "[o]nce the

instant lawsuit was filed, [Smith] was cut off from working overtime."  Dkt. 30 at 32 (2d Am.

Compl. ¶ 233).  Plaintiffs do not allege a single instance in which Smith requested overtime but

was denied that opportunity, much less the date, location, or persons involved.  Nor do they offer

any other contextual information about the alleged act of retaliation.  Other than the perfunctory

allegation that Smith was denied overtime, Plaintiffs have thus failed to plead any "factual

details regarding the circumstances, occurrences, and events underlying the adverse employment

action[s]" that they seek to challenge.  *Badwal v. Bd. of Trs. of Univ. of D.C.*, 139 F. Supp. 3d

295, 311 (D.D.C. 2015) (citation modified).  As a result, the Court cannot determine from the

complaint whether the alleged denial of overtime opportunities, however it was effected,

plausibly was undertaken in retaliation for this suit or for any other protected activity.  Because

24

such a "naked assertion[] devoid of further factual enhancement" does not suffice to state a claim for relief, the Court will grant the motion to dismiss as to Smith's discrete acts of retaliation claims. *Iqbal*, 556 U.S. at 678 (citation modified). The Court will do so, however, without prejudice and will permit Plaintiffs promptly to file a third amended complaint that provides the missing content.

c.   Walker

The District's motion to dismiss treats Walker's discrete acts of retaliation claim as proceeding from the allegedly inaccurate report of the May 16, 2026, incident, which resulted in the misclassification of her absence, Dkt. 34 at 24–25, and Plaintiffs' opposition also addresses only that incident, Dkt. 38 at 18. Defendant assumes that the misclassification, which forced Walker to use personal leave for an absence that would otherwise have been covered as a work-related illness, qualifies as materially adverse but argues that Plaintiffs have not plausibly alleged that this misclassification was causally related to Walker's protected activity. Dkt. 34 at 25. The Court agrees.

Although the precise timing is not entirely clear, the complaint alleges that sometime in early May 2023, after MPD Lieutenant Edwards had made sexually explicit comments to Walker and tried to touch her, she told him that "she was not interested in a romantic or sexual relationship with him." Dkt. 30 at 37–38 (2d Am. Compl. ¶¶ 272–82). She then experienced the incident involving an armed civilian on or about May 16, 2023, and MPD Lieutenant Harris wrote the allegedly inaccurate report of the incident on or about May 17. *Id.* at 38 (2d Am. Compl. ¶¶ 283, 286). Plaintiffs' theory appears to be that Suber ordered Harris to prepare the inaccurate report to retaliate against Walker for her opposition to Edwards's sexual harassment, knowing that the report would unjustly cause Walker to lose coverage for her leave. *See id.* at 40 (2d Am. Compl. ¶ 300). But, as the District emphasizes, Plaintiffs do not allege, let alone

25

support with any specific factual allegations, that Harris or Suber had any knowledge of Walker's interactions with Edwards.  Dkt. 34 at 25.  Moreover, the only fact that Plaintiffs allege in support of their supposition that Suber, rather than Harris (the listed author), was responsible for the report's conclusion, is that "Suber was the watch captain, and it was his duty to write up the incident."  Dkt. 30 at 38 (2d Ad. Compl. ¶ 287).  Given this context, mere temporal proximity between Walker's conversation(s) with Edwards and the subsequent report is not enough to create a plausible inference that Suber was aware that Edwards had sexually harassed Walker and that to retaliate against her for rebuffing Edward's advances, Suber (who had his own history of sexual harassment) ensured that Walker would be charged for taking time off, but hid his involvement in this retribution by directing Harris to write a report that reached a conclusion that Suber had pre-ordained.  *See Twombly*, 550 U.S. at 555–56.

The Court will therefore grant the motion to dismiss as to Walker's claims for individual acts of retaliation.

2.    *Hostile Work Environment*

In addition to their claims of discrete retaliatory actions, Plaintiffs also claim that they were subjected to hostile work environments in retaliation for their protected activity.  Dkt. 30 at 43 (2d Am. Compl. ¶¶ 321, 327).  In their opposition to the motion to dismiss, Plaintiffs withdrew Walker's hostile work environment claims, but they continue to defend the allegations by Ervin and Smith.[5]  Dkt. 38 at 19.

---

[5] In several places, Plaintiffs' opposition relies on exhibits attached to that brief to support Plaintiffs' retaliatory hostile work environment claims.  As explained above, the Court will not consider those materials in resolving the pending motion because they were not included as factual allegations in the operative complaint.

26

"To prevail on a hostile work environment claim, a plaintiff must show that his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Baird v. Gotbaum*, 662 F.3d 1246, 1250 (D.C. Cir. 2011) ("*Baird I*") (citation modified). In considering whether the alleged misconduct rises to the level of a hostile work environment, the Court considers the "totality of the circumstances, including the frequency of the [alleged] discriminatory conduct, its severity, its offensiveness, and whether it [allegedly] interfere[d] with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citation modified). The bar for demonstrating a hostile work environment is "a high one." *Nichols v. Young*, 248 F. Supp. 3d 1, 9 (D.D.C. 2017). The analysis includes a subjective standard, which asks whether the plaintiff "subjectively perceive[d] the environment to be abusive," and an "objective" component, which is evaluated "from the perspective of a reasonable person in the plaintiff's position." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188 (D.D.C. 2012) (citation modified) (first quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); and then quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998)). As the Supreme Court has observed, the "demanding" standard for hostility ensures that "Title VII does not become a general civility code" and serves to "filter out complaints attacking the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation modified). A hostile work environment, if demonstrated, can amount to a separate, actionable incident of unlawful retaliation under Title VII. *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006).

a.    Ervin

The District argues that Ervin fails to state a claim for a hostile work environment because her allegations are largely conclusory and otherwise turn on general disagreements with

"work-related actions" by supervisors.  Dkt. 34 at 27 (citing *Brooks v. Grundmann*, 851 F. Supp. 2d 1, 7 (D.D.C. 2012)).  Ervin first alleges that, after she rejected Suber's sexual advances sometime around May 2020, Suber "became angry and hostile" and used a "curt and harsh" tone with her.  Dkt. 30 at 20 (2d Am. Compl. ¶ 122).  Once the two were working together again in February 2022 (following their overlapping periods of leave), Suber continued to employ a "cold, short, aggressive, sarcastic, and biting" communication style, *id.* (2d Am Compl. ¶ 127); "began a campaign of tracking and harassing [Ervin], placing himself in her presence as much as possible," *id.* at 21 (2d Am. Compl. ¶ 128); and "made threats to Plaintiff Ervin or to others about disciplinary action he was planning to take against [her]," *id.* (2d Am. Compl. ¶ 130).  Later, after Ervin had engaged with the EEO process, Suber became "very angry" about her EEO complaint, *id.* at 24 (2d Am. Compl. ¶ 160), and "escalated his stalking behavior toward [Ervin], tracking her movements, appearing where she was assigned without justification or basis, and asking others to monitor and report her activities to find reasons to write her up for disciplinary action," *id.* at 25 (2d Am. Compl. ¶ 165).

For the most part, those general allegations are conclusory and omit any details of any individual instance of Suber's harassing behavior.  They fail to include the factual allegations required plausibly to allege that Suber's unspecified conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment." *Baird I*, 662 F.3d at 1250 (citation modified).  Merely "characteriz[ing] Defendant's behavior" as harassing or intimidating, without "alleg[ing] specific facts sufficient to support a hostile work environment claim," is not enough to carry Plaintiffs' burden. *Ahuja v. Detica, Inc.*, 742 F. Supp. 2d 96, 104 (D.D.C. 2010).

The complaint does, however, include some more concrete allegations relevant to Ervin's hostile work environment claim.  Ervin alleges that Suber frequently sat in his car in the MPD parking lot to track her arrival to work and then reported her for tardiness when she "was uncharacteristically slightly late" on one occasion in July 2022.  Dkt. 30 at 21 (2d Am. Compl. ¶¶ 131, 133).  Then, after Ervin had filed an EEOC charge, Suber pulled his car behind her during her lunch break on January 4, 2023, and shined a spotlight into her vehicle to "intimidate" Ervin and to "sen[d] the message that [he] was still tracking [Ervin] and was watching her actions."  *Id.* at 26 (2d Am. Compl. ¶¶ 170–72).  Ervin also received a negative performance evaluation in February 2023 (in which Suber does not appear to have played a direct role), *id.* at 27 (2d Am. Compl. ¶ 180), but succeeded in appealing it, *id.* (2d Am. Compl. ¶ 181), and she was then denied the promotion to the Staff Assistant position, *id.* (2d Am. Compl. ¶ 185).  Beyond the conclusory characterizations of Suber's unspecified behavior, Plaintiffs thus allege that Suber monitored Ervin's comings and goings from the parking lot, accurately reported her for tardiness on one day in July 2022, and confronted her with a spotlight in January 2023; and they further allege that Ervin received a negative performance evaluation (with no lasting effects) in February 2023 and was denied a promotion.

These incidents, although troubling, are insufficient to make out a plausible claim of a hostile work environment.  The allegations related to the citation (and pay docking) for tardiness and the negative performance evaluation (as well as the failure to promote, insofar as Plaintiffs seek to use that incident to buttress a hostile work environment claim), involve "work-related actions by supervisors," which are typically insufficient for a hostile work environment claim.  *Brooks*, 851 F. Supp. 2d at 7 (citation modified).  And the singular incident in the parking lot, while plausibly "frighten[ing]," Dkt. 30 at 26 (2d Am. Compl. ¶ 173), and certainly creepy, is not

29

enough, without more, to allege a "pattern of behavior" amounting to a hostile work environment, *Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1, 8 (D.D.C. 2019).

The Court will accordingly grant the motion to dismiss Ervin's hostile work environment claim.

b.   Smith

The District offers similar arguments against Smith's claim for a retaliatory hostile work environment. Dkt. 34 at 27–28.  Plaintiffs allege that, after Smith opposed Suber's sexual harassment, "he did a total 180-degree flip in terms of the way he treated her," Dkt. 30 at 30 (2d Am. Compl. ¶ 208), including by "writing her up for every little violation he could divine" and directing his subordinates to do the same, *id.* (2d Am. Compl. ¶¶ 209–10).  Suber also stalked her, "denied [her] leave requests, [and] assigned her to undesirable tasks and duties." *Id.* (2d Am. Compl. ¶¶ 211–12).  After she asked a union representative to file an EEO complaint, other MPD officers "ostracize[d] [her] for having filed a complaint," *id.* at 31 (2d Am. Compl. ¶ 225), and, following her EEOC charge, she was denied overtime (as discussed above) as well as training opportunities, despite having been "told that she would be the next person to go to Crisis Intervention Officer training, and rifle training," *id.* at 32 (2d Am. Compl. ¶ 234).  Her supervisors began "ordering Plaintiff to do menial tasks that others were spared, assigning her to the least favorable areas to patrol, and most dangerous assignments, and hyper-scrutinizing everything that she did." *Id.* at 32–33 (2d Am. Compl. ¶ 235).  Finally, Plaintiffs allege that Smith was unfairly investigated for the February 2024 incident where her vehicle was attacked. *Id.* at 33–34 (2d Am. Compl. ¶¶ 237–44).

As with Ervin, many of those allegations—such as the references to Suber stalking her, being assigned undesirable tasks and assignments, being ostracized, and being subject to hyper-scrutiny—are conclusory and insufficiently specified to give rise to a plausible inference that

30

Smith experienced a hostile work environment that materially altered her terms and conditions of employment.  The denial of Crisis Intervention Officer and rifle training opportunities, while supported with more detailed factual allegations, also fail to clear the bar.  Such incidents might possibly support a claim for a discrete act of retaliation, *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) (suggesting that exclusion from training activities that "contribute[] significantly to the employee's professional advancement" could support a retaliation claim), but, as discussed above, Plaintiffs do not argue that the lost training opportunities so qualify, Dkt. 38 at 17–18.  Instead, they seek to rely on the trainings as part of a hostile work environment claim.  "[T]his jurisdiction," however, "frowns on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation into a broader hostile work environment claim." *Boone v. MountainMade Found.*, 64 F. Supp. 3d 216, 240 (D.D.C. 2014) (citation modified).

The same is true for Plaintiffs' (largely unspecified) objections to the investigation of the attack on Smith's vehicle and for Plaintiffs' apparent attempts in their opposition to the motion to dismiss to connect Defendant's alleged efforts to terminate Smith to the hostile work environment claim before this Court.  *See* Dkt. 38 at 23–24.  Plaintiffs are free to argue that Smith was terminated in retaliation for her protected activity, but that does not transform the District's alleged efforts to do so into a hostile work environment under the *Harris* standard. Plaintiffs' only remaining non-conclusory allegations—that Smith was denied two training opportunities and, and a later point, investigated for conduct unbecoming an officer in connection with the vehicle incident—do not amount to the pervasive "discriminatory intimidation, ridicule, and insult" necessary to state a claim for a hostile work environment, *Kempthorne*, 550 F.3d at 1201 (quoting *Harris*, 510 U.S. at 21).

31

The Court will accordingly grant the motion to dismiss as to Smith's hostile work environment claim as well.

**D.    Class Claims**

Plaintiffs Ervin and Smith also assert four (essentially identical) class claims under both Title VII and the DCHRA, brought on behalf of the MPD's female civilian and sworn officer employees, respectively, who have suffered sexual harassment and retaliation. *See* Dkt. 30 at 44, 47–52 (2d Am. Compl. ¶¶ 330–31, 340–75). Once again, the parties' presentation of these claims is complicated by Plaintiffs' failure to elucidate the nature of their claims. As a consequence, the District's motion to dismiss and Plaintiffs' response to the motion largely talk past each other. Because Plaintiffs' complaint does not present a single, coherent description of the class claims at issue, the Court will begin by summarizing Plaintiffs' allegations and will then discuss their varying potential interpretations.

As discussed above, Ervin and Smith seek to represent classes of MPD employees "who were subject to or affected by [the] MPD's EEO policies and practices, which had the effect of fostering a work environment that allowed and enabled disparate treatment of female employees via sexual harassment and retaliation, and denied them the protections of [the] MPD's proffered written policies." *Id.* at 44 (2d Am. Compl. ¶¶ 330–31). When outlining the alleged "[c]ommon questions of law and fact" underpinning the class claims, Plaintiffs primarily focus on the work of the MPD EEO office. *Id.* at 45 (2d Am. Compl. ¶ 334). Their identified common questions include whether Lee's management of the EEO office "violated the privacy of [complainants], and encouraged retaliation against complainants;" "created a chilling effect [that] sabotaged otherwise legitimate sexual harassment and retaliation claims;" "caused [the] MPD to reject otherwise legitimate sexual harassment claims;" "caused female employees to be subjected to sexually hostile work environments without recourse;" and ultimately "subjected [female

32

employees] to disparate terms and conditions of employment because of the work culture created by the cumulative effect of [Lee's] actions and directives." *Id.* at 45–46 (2d Am. Compl. ¶ 334). Plaintiffs state that the named Plaintiffs are representative of the putative class members "because they were victimized by sexual harassers who were emboldened by [the] MPD's EEO policies and practices." *Id.* at 46 (2d Am. Compl. ¶ 335).

Plaintiffs' four enumerated class claims (Counts XI–XIV) are captioned "Disparate Treatment Discrimination Based on Gender," or "Disparate Treatment Based on Gender" in violation of Title VII and the DCHRA. *Id.* at 47, 49–50, 52 (2d Am. Compl.). Taking Ervin's Title VII class claim (Count XI) as an example, as the four claims are generally identical, Plaintiffs identify the MPD's "EEO policies and practices, as described above, as specific policies that discriminate against women" and allege that those policies "caus[ed] legitimate complaints from women to be ignored and rejected." *Id.* at 48 (2d Am. Compl. ¶¶ 342–43). After discussing the alleged defects of the EEO office in more detail, including its violations of complainants' confidentiality and its efforts to investigate and undermine complainants, Plaintiffs allege "that the cumulative effect of [the] MPD's policies and practices[] created a workplace environment in which men[] such as [Suber] were encouraged and emboldened to engage in sexual harassment" and likewise "create[d] an environment where women are devalued, ignored, intimidated and marginalized." *Id.* at 48–49 (2d Am. Compl. ¶¶ 344–50). Ervin further alleges "that the reason she endured retaliation and a hostile work environment at [the] MPD after she rejected the sexual advances of her supervisor, is because of the cumulative effect of [the] MPD's EEO policies, which create disparate terms and conditions of employment for women than men." *Id.* at 49 (2d Am. Compl. ¶ 351). Finally, the complaint alleges that the

33

EEO office's "policies and practices not only harmed those who complained, but they harmed women who were too afraid or intimidated to complain as well." *Id.* (2d Am. Compl. ¶ 352).

Given their breadth and lack of specificity, Plaintiffs' class claims are subject to multiple understandings. Perhaps the most natural reading, given the complaint's repeated references to the MPD's EEO policies, is that Plaintiffs' claims center on their alleged mistreatment by the MPD EEO office. One possibility is that Plaintiffs allege that the EEO office failed to take their complaints of sexual harassment seriously or effectively to investigate their complaints because of their sex, subjecting them to adverse treatment based on a protected characteristic in violation of Title VII and the DCHRA. *See id.* at 49 (2d Am. Compl. ¶ 351) (alleging that the MPD Department's policies "create[d] disparate terms and conditions of employment for women than men"). The difficulty with this theory, however, is that Plaintiffs fail to identify the disparate treatment—that is, the discrimination with respect to a term or condition of employment—that the class members are alleged to have suffered because of their sex. They have not alleged that men who complained of sexual harassment received a fair hearing before the EEO office, while women did not. Instead, they simply allege that the office did not do its job. The job, of course, was to prevent and to redress discrimination of all types. But the Court cannot conflate an underlying claim of discrimination, which involves the denial of an employment opportunity or benefit based on the victim's sex, and a challenge to the work of the EEO office, which might foster or permit the underlying discrimination to take place but which, at least as alleged, does not itself distinguish between male and female victims. In other words, as far as the Court can discern, Plaintiffs do not allege that the opportunity for a fair investigation of an EEO complaint is the employment benefit at issue and that this benefit was denied based on the sex of the employee.

34

This failure is particularly notable given that Plaintiffs' class claims appear to include Title VII pattern or practice claims.  In a pattern or practice claim, a plaintiff may bring a class action claim challenging disparate treatment by alleging "that an observed disparity is the systemic result of an employer's intentionally discriminatory practices."  *Segar v. Smith*, 738 F.2d 1249, 1267 (D.C. Cir. 1984).  If a plaintiff can establish that such a discriminatory practice "was the [defendant's] standard operating procedure," then every member of the protected class subjected to that practice "will be presumptively entitled to relief."  *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 362 (1977).  Plaintiffs asserting such claims must bring them in the posture of a class action, *see Marcus v. Geithner*, 813 F. Supp. 2d 11, 20 (D.D.C. 2011), and typically must allege statistical evidence or analogous proof to make out a plausible claim of a practice of disparate treatment, *see Frazier v. Stanley*, No. 16 Civ. 804, 2018 WL 11585450, at *11 (S.D.N.Y. Nov. 29, 2018) (collecting cases).  Plaintiffs have included no such evidence, be it statistical or collections of anecdotes, that the MPD EEO office maintained a discriminatory policy that disadvantaged female employees who brought EEO complaints relative to men who did the same.  To the contrary, the exhibits attached to Plaintiffs' complaint suggest that the EEO office displayed similar hostility to employees who brought claims based on disability, race, or age rather than gender.  Dkt. 30-1 at 13–17 (Carter Aff. ¶¶ 46–49, 61, 63, 71–72).  Moreover, those exhibits claim that, under Lee, the EEO office "did not allow a single claim of discrimination or retaliation to be substantiated" on any grounds whatsoever, rather than singling out female complainants in particular.  *Id.* at 17 (Carter Aff. ¶ 73).

This leads to a second potential gloss on Plaintiffs' class claims; perhaps Plaintiffs' class claims seek to challenge the EEO office's failure properly to investigate their reports of sexual harassment.  The problem with such a claim, as the District emphasizes in the motion to dismiss,

is that Title VII does not provide a general cause of action to challenge "the responsiveness of human resources departments." *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015). Plaintiffs are free to bring Title VII (or DCHRA) actions challenging the sex-based discrimination and/or retaliation that they were subjected to as MPD employees, and they may also challenge their employer's failure to remediate such incidents as itself an act of discrimination or retaliation. *Id.*; *see also Baird I*, 662 F.3d at 1249. Plaintiffs, however, do not plausibly allege that the handling of their EEO complaints was discriminatory for the reasons explained above, and do not frame any of their class claims as challenging *retaliatory* treatment by the MPD EEO office.

Beyond those possibilities, Title VII does not create "an independent cause of action for the mishandling of an employee's discrimination complaints." *Douglas-Slade v. Lahood*, 793 F. Supp. 2d 82, 96 (D.D.C. 2011) (citation modified and collecting cases). At most, a competent EEO office can provide the employer with an affirmative defense against a Title VII claim challenging a sexually discriminatory practice, such as sexual harassment. *See Taylor v. Solis*, 571 F.3d 1313, 1318 (D.C. Cir. 2009). That does not render the absence of an effective EEO process into a separate, actionable Title VII violation absent plausible allegations that the EEO office's failures were themselves discriminatory or retaliatory.

In their opposition to the District's motion to dismiss—which, as discussed above, argues that Plaintiffs have not plausibly alleged that the MPD EEO office disfavored female complainants, and that Title VII does not otherwise provide for a general challenge to the EEO office's efficacy, *see* Dkt. 34 at 29—Plaintiffs seem to disclaim any direct challenge to the EEO office's treatment of their own sexual harassment complaints, *see* Dkt. 38 at 28 ("Plaintiffs are not alleging that Defendant owed them investigation of *their own claims*." (emphasis in

36

original)).  Instead, Plaintiffs appear to characterize their class claims as focusing on their mistreatment by their own supervisors and colleagues, with the EEO office's failure to protect them only being a contributory factor to the work culture that is the direct object of their claims. Plaintiffs cite the D.C. Circuit's opinion in *Bundy v. Jackson*, 641 F.2d 934 (D.C. Cir. 1981), where the court held that an individual claim for sexual harassment was actionable under Title VII if that harassment was the employer's "standard operating procedure" and thereby created a "substantially discriminatory work environment" that altered the plaintiff's "conditions of employment," *id.* at 943–44 (citation modified); *see* Dkt. 38 at 25–28 (discussing *Bundy*).

It is uncontroversial that Plaintiffs may seek relief under Title VII for their own experiences of sexual harassment.  Indeed, Smith and Walker have brought individual claims for sexual harassment in this case, *see* Dkt. 30 at 41–42 (2d Am. Compl. ¶¶ 306–17), which the District has not sought to dismiss.  But that does not resolve the nature of Plaintiffs' separate class claims.  Insofar as Plaintiffs are contending that the complaint is best read to assert claims on behalf of a class of MPD employees who were subject to sexual harassment by predatory supervisors such as Suber (a reading that is, at a minimum, highly debatable), that characterization only raises further difficulties.

First, as the District emphasizes, Plaintiffs have represented that Ervin, who is listed as the class representative for the MPD civilian employee class claims, "does not bring allegations of sexual harassment" based on her own experience at the MPD.  Dkt. 38 at 12.  In fact, it is highly unlikely that Ervin could timely raise any claims at this juncture based on Suber's sexual harassment, which apparently ceased around May 2020.  Dkt. 30 at 19–20 (2d Am. Compl. ¶¶ 115, 121–22).  This failure would be fatal for any potential Title VII sexual harassment class action claim spearheaded by Ervin, as Title VII requires that "at least one named plaintiff" timely

37

exhaust their administrative remedies to bring a class claim. *Thomas v. Reno*, 943 F. Supp. 41, 43 (D.D.C. 1996) (citing *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395 (D.C. Cir. 1988)).

Second, even if the Court were to construe the complaint as alleging that the MPD maintained a pattern or practice of subjecting female employees to sexual harassment as a "standard operating procedure," *Teamsters*, 431 U.S. at 336, and were to assume that Ervin and Smith could serve as named plaintiffs for such a claim, the Court would still dismiss the class claims under Rule 12(b)(6). Beyond conclusory, undeveloped allegations that the MPD "adopted a policy of total indifference to sexual harassment," Dkt. 30 at 14 (2d Am. Compl. ¶ 74), the operative complaint contains only isolated allegations of sexual harassment (or incidents possibly involving sexual harassment) over a period of sixteen years. Notably, some of these events occurred before Lee's tenure at the EEO office, which presents yet another complication for Plaintiffs' efforts to connect them to the EEO office's practices involving discrediting complainants that are discussed—and attributed to Lee—in their amended complaint.

Specifically, Plaintiffs allege that an unnamed female officer complained about being touched by an unnamed male officer at a firing range in Maryland in 2022, *id.* at 12 (2d Am. Compl. ¶¶ 61–62); that Ervin filed an EEO complaint (for unspecified reasons) against an unnamed lieutenant in 2008, *id.* at 16 (2d Am. Compl. ¶ 94); that Suber sexually harassed Officer Hampton in 2007, *id.* at 17 (2d Am. Compl. ¶¶ 99–101); that Suber sexually harassed Ervin in 2020, *id.* at 18–19 (2d Am. Compl. ¶¶ 111–15); that Smith was sexually harassed by unnamed cadets at the MPD academy around 2019, *id.* at 28 (2d Am. Compl. ¶ 193); that Suber sexually harassed Smith around 2022–23, *id.* at 29 (2d Am. Compl. ¶¶ 200–05); that an unnamed training

officer made an unspecified "lewd comment" to Walker around 2019, *id.* at 34 (2d Am. Compl. ¶ 251); that Walker received social media messages from MPD Commander Ennis commenting on her appearance and asking her on a date, *id.* at 34–35 (2d Am. Compl. ¶¶ 252–53); that Walker was propositioned by an unnamed MPD detective in 2021, *id.* at 35 (2d Am. Compl. ¶ 257); that Walker was propositioned by MPD Sergeant Kenny at unspecified times, *id.* at 35–36 (2d Am. Compl. ¶ 260–61); and that Walker was sexually harassed by Edwards around 2023, *id.* at 37–38 (2d Am. Compl. ¶¶ 271–79).  The Court does not doubt the seriousness of those allegations and does not question that many of those incidents could potentially give rise to individual claims for sexual harassment under Title VII or the DCHRA of the kind that Smith and Walker have asserted in this litigation.  But a Title VII pattern or practice claim requires "more than the mere occurrence of isolated or accidental or sporadic discriminatory acts," and Plaintiffs must therefore allege facts that "give rise to a plausible inference of a regular practice" of sexual harassment by MPD supervisors and colleagues.  *See Townsend v. United States*, 236 F. Supp. 3d 280, 306 (D.D.C. 2017) (citation modified) (quoting *Teamsters*, 431 U.S. at 336). Alleging around 10 incidents of sexual harassment (ranging from a lewd comment to physical touching) involving a half-dozen perpetrators (many without any description or explanation beyond a perfunctory allegation that the sexual harassment occurred) over a sixteen-year period at an organization with hundreds of senior officers and thousands of other employees is not sufficient to create a plausible inference that female employees across the MPD are subjected to unlawful sexual harassment as a matter of course.[6]  *See Frazier*, 2018 WL 11585450, at *11–12

---

[6] The Court takes judicial notice of the fact that, according to the MPD's 2023 Annual Report, the police force included 2,647 officers and detectives, 375 sergeants, 130 lieutenants, 41 captains, and 35 commanders, in addition to civilian employees.  Metropolitan Police Department, *2023 Annual Report* 50 (2024), available at https://perma.cc/FTV7-3J9E.

(discussing how, for a larger organization, a higher number of alleged incidents is required plausibly to allege a discriminatory pattern or practice).

Plaintiffs' failure to state a claim based on an unlawful pattern of sexual harassment at the MPD stands in sharp contrast to the allegations concerning the functioning of the MPD EEO office.  If the Court were asked to assess whether Plaintiffs plausibly had alleged that the EEO office, as a standard operating procedure, refused to carry out good faith investigations of complaints of discrimination and instead sought to discredit MPD employees who filed complaints, its answer may well be different.  But, as explained above, Title VII does not recognize a cause of action for pattern or practice claims alleging that an EEO office was incompetent or even actively malicious in its treatment of *all* complaints of discrimination. Instead, Title VII permits Plaintiffs either to challenge the EEO office's alleged practices as discriminatory or retaliatory in and of themselves or to challenge the underlying misconduct (while invoking the EEO office's indifference to hold the agency responsible for the misdeeds of individual employees).  Plaintiffs have disclaimed the first theory, and their allegations fail to state a pattern or practice claim with respect to the second theory.

Finally, the Court pauses to address one other potential framing of Plaintiffs' class action claims (albeit one not addressed in either party's briefing).  Portions of the operative complaint arguably portray Plaintiffs' injuries as stemming not from their sexual harassment, but from the hostile treatment they experienced in retaliation for reporting sexual harassment to the EEO office.  *See* Dkt. 30 at 3 (2d Am. Compl. ¶ 5) (describing the class as including female employees who were "retaliated against for opposing sexual harassment" and suffered "disparate terms and conditions of employment due to Defendant's hostility towards women who complained of sexual harassment"); *see also id.* at 49 (2d Am. Compl. ¶ 351) (alleging, as part of

40

the class claim, that Ervin "endured retaliation and a hostile work environment at MPD after she rejected the sexual advances of her supervisor . . . because of the cumulative effect of [the] MPD's EEO policies"). Rather than directly alleging an environment pervaded by sexual harassment, then, Plaintiffs' class claims might arguably be construed as alleging that a class of women were subjected to hostile retaliatory treatment after they reported sexual harassment, facilitated by the EEO office's policy of leaking complainants' information.

To be sure, this is not the most straightforward reading of Plaintiffs' class claims, which, among other things, are captioned as discrimination claims rather than retaliation claims. The District's motion to dismiss understandably does not address this theory, and Plaintiffs do not reference it in their own opposition. But this framing does at least involve an (arguably) identifiable MPD pattern or practice of targeting employees who made EEO complaints, which is alleged to have been pervasive under Lee's leadership.

The Court will, nonetheless, grant the motion to dismiss insofar as the second amended complaint can be construed as asserting that claim. First, the Court has already dismissed Plaintiffs' claims of retaliatory hostile work environments (and most of Plaintiffs' discrete acts of retaliation claims), which complicates any effort to treat Ervin or Smith as named plaintiffs for analogous class claims. Second, the complaint lacks adequate specificity as to the nature of any retaliation experienced by any person at the MPD other than the three individual plaintiffs in this case. It does not, as a consequence, give rise to a plausible inference that the MPD has maintained a pattern or practice of subjecting employees who file EEO complaints to hostile work environments, beyond the EEO office's own failure properly to investigate their claims.

In conclusion, the Court reiterates that it does not question that Plaintiffs plausibly have alleged that they experienced severe sexual harassment while serving in the MPD or that the

MPD EEO office failed to respond to their (and other) complaints in good faith. Nor should the Court's holding be read to suggest that Plaintiffs seeking to bring Title VII pattern or practice claims must, before they have been given the opportunity to conduct discovery, include the specific details of every alleged incident of sexual harassment. Here, however, Plaintiffs have both failed to allege a pattern of similar incidents extending beyond the individual claims presented in their complaint and, more seriously, to connect those additional incidents to any colorable claim or legal theory asserted by the named plaintiffs in this matter. Plaintiffs do not allege facts that might, for example, connect the few additional incidents mentioned in the complaint—let alone any hypothetical pattern of pervasive sexual harassment at the MPD—to the direct perpetrators' understanding or belief that Lee would look the other way, thus prompting them to engage in brazen misconduct. Indeed, as the preceding discussion should make clear, it is difficult to discern from the second amended complaint precisely what MPD pattern or practice Plaintiffs seek to connect to any pervasive discriminatory results they might allege occurred. If Plaintiffs wish to proffer a third amended complaint that sufficiently identifies an individual pattern or practice of the MPD that they wish to challenge on a class-wide basis and that they can connect to a class-wide injury, and if they can explain why the named Plaintiffs here are eligible to bring such a claim, they may promptly file a motion for leave to amend.

 The Court will therefore grant the motion to dismiss Plaintiffs' class claims.

## CONCLUSION

For the foregoing reasons, Defendant's partial motion to dismiss, Dkt. 34, is hereby

**GRANTED** in part and **DENIED** in part.

      **SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  July 24, 2026